**INDEPENDENT LIVING RESOURCES, a non-profit corporation, and Robert W. Pike, Plaintiffs,**

v.

**OREGON ARENA CORPORATION, Defendant.**

**No. Civ. 95–84–AS.**

United States District Court, D. Oregon.

April 8, 1998.

---

Steve Brischetto, Portland, OR, for Plaintiffs.

David B. Howorth, Foster, Pepper & Shefelman, Portland, OR, Frank C. Morris, Jr., Carolyn Doppelt Gray, Epstein, Becker & Green, P.C., Washington, DC, for Defendant.

Okianer Christian Dark, U.S. Attys. Office, Portland, OR, Thomas M. Contois, U.S. Dept. of Justice, Civil Rights Div., Washington, DC, for Amicus, USA.

## SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

ASHMANSKAS, United States Magistrate Judge.

### INTRODUCTION

This is an action alleging violations of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.,* at the "Rose Garden," a multi-purpose indoor arena in Portland, Oregon. In an opinion filed on November 12, 1997, the parties' cross-motions for summary judgment were granted in part and denied in part. *Independent Living Resources v. Oregon Arena Corporation,* 982 F.Supp. 698 (D.Or.1997). The court reserved a ruling on many additional issues.

Although most of the underlying facts in this case are not seriously disputed, I set a court trial so the remaining issues could be decided without the limitations imposed by the summary judgment standard. On January 23–24, 1998, I heard testimony and argu-

ment regarding the remaining issues in this case. A portion of those proceedings were conducted at the Rose Garden so the participants could view the premises and, where appropriate, test and measure the conditions in dispute.

To simplify matters, the Findings of Fact and Conclusions of Law were bifurcated. One set, filed on March 26, 1998, addressed dozens of miscellaneous issues such as toilets, doors and signs. *Independent Living Resources v. Oregon Arena Corp.*, 1 F.Supp.2d 1124 (D.Or.1998). The present set covers modified aisle seats, infilling and ticket sale policies.

## DISCUSSION

### A. Modified Aisle Seats

■ Standard[1] 4.1.3(19) provides that, in addition to the required number of wheelchair spaces, "one percent, but not less than one, of all fixed seats shall be aisle seats with no armrests on the aisle side, or removable or folding armrests on the aisle side." In the commentary that accompanied this regulation, the Access Board explained that these seats are intended for use "by wheelchair users who wish to transfer to a fixed seat and individuals with other mobility impairments for whom armrests present an obstacle." 56 Fed.Reg. 35,408, 35,425 (July 26, 1991). The latter appears to be a reference to persons who use crutches or a walker or who need to sit with one leg outstretched (because of injury or disease) or who, for various reasons, have difficulty reaching a seat in the middle of a row.

While it is undisputed that defendant has provided the requisite quantity of seats, only 14 of those 191 seats are located on wheelchair-accessible routes. To reach the remaining 177 modified aisle seats, the patron

must traverse from one to three steps. Plaintiffs contend that all modified aisle seats must be wheelchair-accessible.

The prior opinion discussed, at some length, both the history of the regulation and some practical concerns regarding its implementation. *Independent Living*, 982 F.Supp. at 728–32. Rather than repeat that entire discussion, I will incorporate it here by reference (and formally designate as "findings of fact" those portions to which that label applies).

■ In the earlier opinion, I determined that "both DOJ and the Access Board consistently have interpreted Standard 4.1.3(19) to require that either some or all of the modified aisle seats ... be accessible to persons in wheelchairs." *Id.* at 729. I reaffirm that finding here. While I agree that this requirement should have been set forth more clearly in the text of the regulation, it is implicit in the purpose of those seats as articulated in the commentary accompanying the regulation. In that respect, it is almost the exact opposite of the situation with the "line of sight over standing spectators" requirement. In the latter instance, the commentary indicated that the agency was deferring that issue until a subsequent rulemaking, which contradicted the interpretation that DOJ sought to give to the regulation. *Independent Living*, 982 F.Supp. at 743. Here, by contrast, the commentary is consistent with the agency's interpretation of the rule. I cannot say that DOJ's interpretation of the modified aisle seat requirement is "plainly erroneous or inconsistent" with the regulation. *Cf. Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (agency's interpretation of its own regulations must be sustained unless "plainly erroneous or inconsistent" with the regulation).[2]

---

1. As in the earlier opinions, the term "Standard" refers to the "standards for accessible design" promulgated by the Department of Justice ("DOJ") and codified at 28 CFR Part 36, App. A.

2. I have carefully reviewed the other arguments made by defendant. *See, e.g.*, Defendant's Supplemental Brief (docket # 186) at 13–25 (and supporting exhibits). Defendant has not convincingly demonstrated that the language of the regulation was merely a drafting error, and that

DOJ actually intended to require only that one percent of all *aisle* seats be modified, as opposed to the present requirement that one percent of *all* seats be modified aisle seats. Indeed, if the rule were as defendant contends, then in many facilities the requirement would be measured in hundredths of a seat (*e.g.*, a multi-plex theater with seven rows would have to provide 14/100 of a modified aisle seat). In addition, if this was merely a drafting error, DOJ has had seven years

I previously denied both parties' motions for summary judgment to allow the parties a final opportunity to present additional evidence on "whether defendant could have located more than 14 (though less than 191) modified aisle seats on wheelchair-accessible routes" and whether the modified aisle seats that were not wheelchair-accessible were nevertheless "within the range of many individuals who walk with the aid of crutches or a walker." *Id.* at 730.

After hearing additional evidence and arguments, and viewing examples of those modified aisle seats at the Rose Garden, I continue to believe that the entire concept of "modified aisle seats" needs to be re-examined with regard to both its underlying rationale as well as the practical problems of implementing this concept in the real world. *See Independent Living*, 982 F.Supp. at 729–32. At a minimum, the regulations must provide far more guidance than they presently do so arena designers know what is expected of them.

On the other hand, there is very little evidence in this record to suggest that defendant made a good faith effort either to ascertain what was required of it or to actually make the modified aisle seats at the Rose Garden accessible to persons with disabilities.

The court finds that the vast majority of modified aisle seats at the Rose Garden are essentially useless for their intended purpose of providing seating for persons with disabilities. 177 of the 191 seats can be reached only by *laterally* traversing several stairs. To reach the seat, the patron must walk across a stairway that bisects the route to the seat at a right angle. When traversing this stairway, the left foot is likely to be on a different step (and at a different elevation) than the right foot, which requires an awkward gait. Crossing the stairway would clearly pose a substantial obstacle to many persons with mobility or balance impairments. These seats are, of course, entirely inaccessible to persons who use wheelchairs and, therefore, can not be utilized as wheelchair transfer seats.

Assuming the patron is able to reach one of those modified aisle seats, his ordeal has just begun. There is no place—secure or otherwise—to store a wheelchair, walker, crutches, or similar appliances. There isn't even sufficient room to store such equipment behind a seat or to lean it against a wall. In addition, although these seats are also intended to be used by persons who need to sit with one leg outstretched, there is no room to do so. Rather, defendant designed and built most of these seats so an outstretched leg or foot (or other appendage) would protrude into the narrow staired aisle that is the primary access route used throughout the event by hundreds of patrons in that seating section. There is a real danger that the protruding limb might be stepped on or

---

to correct it or to issue an interpretive regulation, but has not done so. (The unadopted recommendations of a study committee that sought to abolish the requirement are not sufficient). Moreover, the contemporaneous Access Board commentary contradicts defendant's position. *See Independent Living*, 982 F.Supp. at 728–29 (requirement for one percent wheelchair spaces and one percent modified aisle seats was adaptation of formula under earlier accessibility codes that required two percent wheelchair spaces).

I also am not persuaded by defendant's argument that modified seats must be wheelchair-accessible only in facilities such as movie theaters that have sloped aisles, but not in arenas or stadiums that have staired aisles. Defendant has not shown that this was DOJ's intent, or that the agency has interpreted the rule in that manner, nor has defendant shown that it was not possible to provide considerably more than 14 wheel-

chair-accessible modified aisle seats at the Rose Garden.

Somewhat more troubling is the last sentence in Standard 4.1.3(19)(a), which states that "[a]isle seats are not required to comply with [Standard] 4.33.4." The latter provides that the floor at wheelchair locations shall be level and comply with Standard 4.5, which in turn articulates standards for surfaces along accessible routes and in accessible rooms. The statement that aisle seats are not required to comply with Standard 4.33.4 could be viewed as implying that they need not be wheelchair-accessible. On the other hand, the exclusion from 4.33.4 may simply have been intended to address the concerns of facilities such as movie theaters in which both the access aisles and the floor under all seats are sloped. The mixed inferences to be drawn from this sentence are not so conclusive as to warrant overruling the interpretation of Standard 4.1.3(19)(a) endorsed by DOJ.

tripped over, which poses an unacceptably high risk of injury both to the disabled patron and to other spectators.

Defendant also chose not to add additional leg room to those rows that have modified aisle seats. As a result, if a patron in the middle of the aisle wants to use the restroom or visit the concession stand, it is a tight squeeze as the remainder of the row must stand or somehow move aside. While that is merely an inconvenience for most spectators, it is far more problematic if the person occupying the aisle seat cannot stand or walk without assistance, or has an outstretched leg, or some other mobility impairment. The same problem might occur during an emergency requiring evacuation of the building.

The bottom line is that the court has a difficult time conceiving of any person who could benefit from these 177 modified aisle seats as they have been constructed at the Rose Garden, except for those individuals who don't need a modified aisle seat in the first place.[3] The 14 wheelchair-accessible modified aisle seats are somewhat better, but they suffer from some of the same defects as well.

Defendant argues that, with only 72 vomitories[4] and a maximum of two modified aisle seats per vomitory, it was not feasible to make all 191 modified aisle seats wheelchair-accessible. Perhaps so, but there is a significant difference between the 144 potential wheelchair-accessible aisle seats (72 vomitories with 2 seats each) versus the 14 wheelchair-accessible aisle seats that defendant actually provided. Defendant, which has the burden of proving its affirmative defense, has not shown that it was incapable of providing more than 14 wheelchair-accessible modified aisle seats, albeit at the cost of some lost seats and ticket revenues.[5] Nor is there any evidence that defendant ever informed the Access Board or DOJ that it was having difficulty complying with the regulation, or solicited guidance on what to do in that circumstance, or even asked DOJ what percentage of these seats needed to be wheelchair-accessible. The overwhelming inference, from defendant's conduct concerning both this and other regulatory issues, is that defendant did not make such inquiries because it did not want to know the answer, preferring instead to adopt an unreasonably narrow interpretation of the legal requirements while ignoring all contrary information.

Defendant also argues that the 14–seat limitation is inherent in the particular arena design that defendant selected. Perhaps so, but defendant has offered no evidence that this was the only possible design for the Rose Garden. Nor has defendant shown that—had it actually given any thought as to how these seats were intended to be used—it could not have remedied many of the other deficiencies in these modified aisle seats.[6]

3. One possible exception is a severely obese individual who might not fit into a regular seat, but perhaps could utilize a seat that did not have an armrest.

4. A "vomitory" is an entrance into the seating bowl from the concourse.

5. The expert affidavit submitted by defendant says only that it was not feasible to make all 191 modified aisle seats wheelchair-accessible, since that would require 96 vomitories in addition to those needed for wheelchair spaces, when the Rose Garden has only 72 vomitories. Affidavit of Gordon Wood (docket # 189). However, Wood does not deny that it was possible to provide more than 14 wheelchair-accessible modified aisle seats, though less than 191.

6. It is not difficult to conceive of modifications that might have solved some of the defects plaguing the modified aisle seats at the Rose Garden. For instance, under the present design a patron enters the seating bowl through a vomitory and almost immediately encounters a stepped vertical aisle leading to the seating sections above and below. There is also a row of seats at the same elevation as the vomitory. While not a professional architect, the court sees no obvious reason why defendant could not have made that row a few feet deeper, and incorporated a landing into the staired aisle at that same elevation. That would create a flat pathway wide enough for a wheelchair (or a person using other mobility devices) to cross the stairway (at the landing) and reach the modified aisle seat. The added depth of this row would also provide the requisite legroom, and perhaps even space to store some mobility devices. On each level of the arena, there are several dozen vomitories at the same elevation. Consequently, by modifying just that one row all the way around the arena, defendant seemingly could have created dozens of wheelchair-accessible modified aisle seats that would actually have been of some use to persons with disabilities. Increasing the depth of that row would affect the sightlines, but that could be addressed by adjustments to elevations.

In summary, it takes more than just a removable armrest to make a modified aisle seat that is in fact useful for persons with mobility impairments. The Access Board and DOJ have done a dismal job of articulating design standards for those seats, but defendant also shares a significant degree of responsibility for the present situation. The court finds that the existing configuration of the modified aisle seats at the Rose Garden does not comply with the requirements of the ADA and of the Title III regulations as those have been interpreted by the Access Board and DOJ.

■ In deciding what remedy to order, the court will take into account that the regulation is poorly drafted and its requirements far from explicit. Indeed, while DOJ has insisted that at least some percentage of the modified aisle seats be wheelchair-accessible, DOJ has never publicly defined just what that percentage is, a serious omission from the standpoint of anyone attempting to design a quarter-billion dollar arena in compliance with the regulation. Nor will this court attempt to define that number here. That task is the province of the Access Board and DOJ, not the courts, notwithstanding that those agencies often appear to have been missing in action when it comes to clarifying these and other Title III issues. Defining some ideal number would also be a largely academic exercise in the context of this case, since the Rose Garden is already built and there is only so much that can be done to increase the number of accessible modified aisle seats without demolishing the

entire building and starting over. While this court clearly has the authority to order such a remedy, the circumstances here do not warrant such drastic measures.

For now, the court is less concerned with what ought to have been done—if the arena was still on the drawing board—and will focus instead on what realistically can be done at this late date to ensure that a sufficient number of modified aisle seats are both available, and actually usable, to meet the needs of persons with disabilities.

Within 45 days from the date of this opinion, defendant shall submit a proposal to remedy the deficiencies described above. The proposal should simultaneously address any modifications to the seating bowl required by the opinion dated November 12, 1997. Defendant also has 45 days from the date of this opinion to submit its proposal for remodeling the suites to address the violations discussed in the opinion filed on March 26, 1998.

A related issue is whether the modified aisle seats are actually available for use by persons with disabilities or whether, as with the wheelchair spaces, tickets for the vast majority of modified aisle seats at the Rose Garden have been sold (often years in advance) to ambulatory spectators. The court will address that issue below, along with other ticket and infilling matters.

## B. Ticket Sale Policies and Infilling of Wheelchair Spaces

The question posed here is whether the wheelchair spaces at the Rose Garden must

---

Another obvious modification would have been to indent rows with modified aisle seats, e.g., by removing the end seat. That would create a small buffer of space between the modified aisle seat and the aisle traffic, which would help to minimize some of the problems associated with the present design. In lieu of providing more leg room for the entire row, simply removing the seat directly in front of the modified aisle seat might provide sufficient room for other patrons to squeeze by the disabled spectator.

Defendant also might have designed the arena to provide storage areas for mobility devices, either built into each vomitory or adjacent thereto. So long as the storage area was nearby, it would minimize many of the problems associated with storage and retrieval of those mobility devices. Plaintiffs have also suggested that modified seats could be sited adjacent to wheelchair

seating areas, which would provide a wheelchair-accessible route and potentially a place to store mobility devices during the event (providing all of the wheelchair spaces were not occupied).

Of course, each of these modifications might have resulted in some loss of seating capacity and therefore revenue. Whether those costs are outweighed by the benefits that would be derived by persons with disabilities—and who ultimately should pay for such costs—is a policy question that under our tripartite system of government must be decided by Congress and the administrative agencies charged with making such decisions, not by the courts. Accordingly, this court's finding that it was possible for defendant to have more fully complied with the law should not be construed as expressing any opinion regarding the wisdom of those legal requirements.

actually be available for use by persons in wheelchairs, and whether the modified aisle seats must actually be available for use by persons who require a special aisle seat.

As matters stand, the vast majority of wheelchair spaces at the Rose Garden are routinely infilled with tiers of conventional seats which have been sold, on a season ticket (or longer) basis, to ambulatory patrons. A person in a wheelchair cannot purchase a ticket for one of these wheelchair spaces: not now, not next year, and not in the foreseeable future. Tickets for modified aisle seats likewise have been sold almost exclusively to ambulatory patrons who don't need a modified aisle seat. This topic was discussed at length in the prior opinion. *Independent Living*, 982 F.Supp. at 717–24, 731 n. 45. To avoid repetition, I will incorporate that discussion here by reference.

### 1. Whether Defendant OAC is Responsible for Infilling & Ticket Sale Policies

■ Defendant renews its argument that decisions regarding infilling, ticket sale policies and other operational matters are made by individual event promoters, hence, defendant is not responsible for those conditions. The court disagrees with that proposition—both factually and legally—for the reasons articulated in the prior opinion. *Independent Living*, 982 F.Supp. at 718–19. *See also* 28 CFR § 36.204.

### 2. Wheelchair Spaces

#### a. Findings of Fact

1. On paper, the Rose Garden has 191 wheelchair spaces (in the basketball configuration).[7]

2. Most of those 191 wheelchair spaces are not available for use by a person in a wheelchair. Instead, the wheelchair spaces are systematically infilled with portable tiers of ambulatory seats for which tickets have been sold to ambulatory patrons, usually on a season ticket or longer basis.

3. In an arena such as the Rose Garden, wheelchairs occupy more space than conventional seats, due to their size, the necessity of providing a wide aisle and room in which to maneuver, and the requirement to provide a companion seat next to each wheelchair space.

4. At every Trail Blazers game at the Rose Garden, a minimum of 133 wheelchair spaces are infilled with at least 1,028 conventional seats, tickets for which have been sold far in advance on either a season ticket or longer basis. At least 27 of the 40 wheelchair sections are "in-filled completely" for every game.

5. At every Trail Blazers game at the Rose Garden, an additional 33 wheelchair spaces are isolated high up on Level 7, a practice which this court previously found to be in violation of the ADA. *Independent Living*, 982 F.Supp. at 712–13. Some of these 33 wheelchair spaces are infilled and the tickets sold to ambulatory patrons, often months in advance of the game.

6. Some or all of the remaining 25 wheelchair spaces (*i.e.*, those in locations other than Level 7) may be infilled depending upon the demand for ambulatory tickets for a particular game.

7. At least 84% of the non-Level 7 wheelchair spaces are routinely infilled for every game, not counting the additional infilling that occurs for individual games.

8. Infilling wheelchair spaces and selling those seats to ambulatory patrons increases the seating capacity of the Rose Garden. It is estimated that this practice generates roughly an additional two to three million dollars a year in gross ticket sale revenue for the Trail Blazers, although that number may vary depending upon such factors as whether the Trail Blazers make the playoffs and the overall demand for Trail Blazers tickets. The additional conventional seating capacity also generates added revenue from concessions and other collateral sources.

9. Infilled wheelchair spaces are not available for use by patrons in wheelchairs.

---

7. I previously determined that some of those 191 spaces should not be credited towards compliance with the regulation because those spaces are improperly clustered in a few locations. *Independent Living*, 982 F.Supp. at 712–13, 716–17.

10. The Trail Blazers' business plan calls for selling all but 1,500 of the seats in the Rose Garden on a season ticket basis. Of the remaining seats, some are sold in multi-game packages, while others are available for individual games.

11. In May 1994, more than a year before the Rose Garden was operational, future season tickets (at the Rose Garden) were offered to all current holders of season tickets at the Memorial Coliseum (which was home to the Trail Blazers before the Rose Garden was built). Next, season tickets (or longer-term contracts, where applicable) were offered to persons with disabilities. Defendant has represented that "there was an exclusive three-week marketing period with an extensive publicity campaign directed solely at the disabled community." (January 24, 1998 Tr. 15).[8] No season tickets were purchased. Future season tickets were then offered to all persons who were already on the waiting list to buy season tickets at the Coliseum. If there were not enough conventional seats available in a particular section to satisfy the demand for season tickets, the wheelchair spaces in that section were infilled with conventional seats which were then sold to ambulatory patrons on the waiting list. The Trail Blazers next offered additional season tickets to those who were current season ticket holders at the Coliseum. Again, wheelchair spaces were replaced by conventional seats and sold to ambulatory patrons who wanted seats. Finally, any remaining season tickets were offered to the general public, including persons with disabilities. The end result is that most seats for Trail Blazers games at the Rose Garden have been sold on a season ticket basis (or longer) to those who were existing season ticket holders at the Coliseum, few (if any) of whom use a wheelchair.

12. Once a seat is sold on a season ticket basis, the holder has the right (or in many cases, the obligation) to renew that ticket each year, and most do renew. The renewal rate for Trail Blazers season ticket holders has historically been very high.

13. Season ticket holders are entitled to renew their subscription each year notwithstanding that an ambulatory patron is occupying a designated "wheelchair" space and without regard to whether that space has been requested by a person using a wheelchair.

14. A "great percentage" of season ticket holders at the Rose Garden are on a multiyear purchase basis, which means they not only have the right to renew their subscription but are contractually obligated to do so. Tickets for the most desirable seats at the Rose Garden require the purchase of a multiyear contract for five, seven, or nine years.

15. When this action was filed in January 1995, tickets for Trail Blazers' games were in very high demand. Home games invariably were sold out. Tickets to home games were available (directly from the Trail Blazers) almost exclusively on a season ticket or longer basis.

16. Although public demand for Trail Blazers tickets has tapered off somewhat during the past few years, along with the team's performance on the court, a high percentage of tickets for home games continue to be sold in advance on a season ticket (or longer) basis.

17. Tickets to Trail Blazers games are freely transferable. The owner of a ticket may re-sell it, trade it, or give it as a gift to a third party. The only restriction upon such activity is that the sale of a ticket for more than its face value may in some instances violate state or local laws against "scalping."

18. All tickets to Trail Blazers games are "reserved" seats. In other words, the bearer is entitled to sit only in the particular seat designated on the ticket.

19. While there are some devoted fans who purchase a season ticket and attend every home game during the season, it also is not uncommon for two or more persons to share a season ticket, with each participant receiving a portion of the tickets for the season. Alternatively, season ticket holders

---

**8.** This step was inadvertently omitted from the summary in the prior opinion. *Independent Living,* 982 F.Supp. at 719. However, its absence did not affect the conclusions reached or the opinions expressed in that earlier opinion.

may elect to attend some games, and give the tickets for the remaining games to friends, relatives, clients, business associates and co-workers, or else sell the undesired tickets. Such "surplus" tickets for individual Trail Blazers games have traditionally been sold via classified advertisements placed by season ticket holders or through other sources. Professional businesses, such as law firms, also buy season tickets and then make tickets for individual games available to partners, employees, and clients.[9]

20. An ambulatory patron who is not a season ticket holder, but desires to attend a Trail Blazers game, may obtain a ticket from a friend, relative, or business associate who has a season ticket, or else purchase an excess "season" ticket for a single game through the classified advertisements or a ticket broker. Ambulatory patrons can use any of the thousands of "season" tickets that exist for each game.

21. Those in wheelchairs do not have the same options that are available to ambulatory patrons. They cannot use an extra ticket offered by a friend, relative or business associate, or a surplus ticket purchased via the classified advertisements, unless the ticket happens to be for a wheelchair space. That is extremely unlikely, since every (or almost every) season ticket in the entire Rose Garden has been sold to ambulatory patrons, and the wheelchair spaces in those sections have been in-filled.

22. A person who uses a wheelchair has a more difficult time (than an ambulatory patron) sharing a season ticket with one or more persons. There are no existing season tickets for wheelchair spaces, so the individual could not share an existing ticket. If the group managed to obtain a season ticket for a wheelchair space, everyone who uses the ticket (and any companions) would have to sit in a wheelchair location, even if all individuals attending that particular game are ambulatory.

23. Defendant recently advised the court that if a person in a wheelchair arrives at a Trail Blazers game with a ticket for a conventional seat, defendant will attempt to seat that individual in a wheelchair space in a comparable (or better) location. If no comparable or better wheelchair space is available, then defendant will seat that individual in the best available wheelchair space and also furnish him or her with a complimentary ticket for a future game. This is an informal policy, and defendant has not disseminated information about it through the media or even directly to organizations that assist persons with disabilities. Defendant expressed concern that this policy could be abused if it became widely known. Plaintiff Pike, who uses a wheelchair and is very active in a number of organizations that assist persons with disabilities, testified that he was previously unaware of this policy.

24. At deposition, defendant's Vice President of Business Affairs testified that the company has no policy requiring that wheelchair spaces be retained up until 24–48 hours before an event. Rather, once the inventory of conventional seats for a section has been sold, the wheelchair spaces are infilled and tickets sold to ambulatory patrons. Defendant now contends that this testimony was erroneous, and some wheelchair spaces are retained as "trouble" seats or for day-of-game sales.

25. Wheelchair spaces are not infilled individually, but rather as a group using portable tiers of seats. Consequently, if even one ambulatory ticket is sold for an infilled seat in a given wheelchair section, all of the wheelchair spaces in that section will be infilled (except in the few instances where the wheelchair section is large enough that it can be split, with only a portion of it infilled). Conversely, the presence of a single wheel-

---

9. I reject defendant's suggestion that there is insufficient evidence in the record of this "secondary market" for Trail Blazers' tickets. It is common knowledge, especially throughout the business and legal community in Portland (which are among the largest participants in that market). Similar markets exist in other large cities that have a popular sports franchise. One can also read the classified advertisements in local newspapers offering to sell Trail Blazers tickets. The court finds that this is an appropriate subject for judicial notice. In addition, Robert Pike testified that he has personal knowledge of such a market. Defendant has offered no contrary evidence.

chair in a given wheelchair section precludes infilling of that entire section, which may displace dozens of ambulatory seats.

26. Because each wheelchair location can be infilled with dozens of conventional seats, an event promoter has a powerful economic incentive to discourage wheelchair users from attending games, to cluster them in only a few locations (thereby freeing up other locations for infilling), or to steer wheelchair users to less desirable locations.

27. On at least several occasions, wheelchair users who attempted to purchase tickets for an event were told that no wheelchair tickets were available, even though ambulatory patrons were able to purchase tickets for the same event. On other occasions, wheelchair users were "steered" to distant corners of the arena (such as Level 7) while ambulatory friends were able to purchase good tickets for the same event. Defendant has denied knowledge of any such incidents, and (if true) blames the problem on independent ticket vendors or honest mistakes. Some of these incidents occurred as late as March 1997, well after the time when any start-up bugs should have been resolved and after that specific issue had been called to defendant's attention in the course of this litigation.

28. Shortly before trial, plaintiff Pike was able to purchase a ticket for a prime wheelchair space near mid-court for a Trail Blazers game.

### b. Conclusions of Law

■ Title III of the ADA outlaws not just intentional discrimination but also certain practices that have a disparate impact upon persons with disabilities even in the absence of any conscious intent to discriminate. Thus, a public accommodation may not "utilize standards or criteria or methods of administration that have the *effect* of discriminating on the basis of disability, or that perpetuate the discrimination of others who are subject to common administrative control." 28 CFR § 36.204 (emphasis added). Within reason, a public accommodation may

be required to modify its policies, practices, or procedures to mitigate any disparate impact upon persons with disabilities. 28 CFR § 36.302(a). Public accommodations must also take affirmative measures to ensure that such persons have an equal opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations that are available from that public accommodation. 42 U.S.C. § 12182; 28 CFR §§ 36.202(b), 36.201(a).

The ticket sale and infilling policies utilized at the Rose Garden effectively preclude wheelchair users from obtaining the same benefits available to ambulatory patrons, in violation of 28 CFR §§ 36.201(a), 36.202(b), 36.204, and 36.302(a). On paper, no Trail Blazers tickets are available in many sections of the arena for either conventional seats or wheelchair spaces because all tickets have been sold on a season ticket (or longer) basis. In reality, however, tickets for individual games are widely disseminated. An ambulatory patron potentially can acquire and use any ticket in the arena. Wheelchair users do not have the same option, because all outstanding tickets are for conventional seats which they cannot utilize.

Wheelchair users are thus precluded from accepting a gift ticket, going to the game with a friend who has an extra ticket, sharing a season ticket, purchasing a ticket for an individual game from a season ticket holder, and similar options each of which is available to ambulatory patrons. Defendant and the Trail Blazers may not be active participants in this secondary market, but that does not mean they can simply ignore its existence.[10] That is particularly true when defendant and its principal tenant have helped to create and to perpetuate this state of affairs by the manner in which they have chosen to sell tickets (or by permitting persons who stage events at the Rose Garden to engage in such practices).

Two additional regulations relevant to this issue are Standard 4.1.3(19), which requires defendant to provide 191 wheelchair spaces

---

10. Arguably, the Trail Blazers (like many sports teams) benefit from the existence of this secondary market. The transferability of tickets, which allows them to be shared, given as gifts, or re-

sold, encourages the purchase of season tickets by businesses (historically a tax deductible expense), and by those who do not want to attend every game (or to pay for unused tickets).

(in the basketball configuration), and Standard 4.33.3, which permits infilling of wheelchair spaces with *readily removable seats* when the wheelchair spaces *are not needed* to accommodate wheelchair users. From a purely physical standpoint, the infilled seats at the Rose Garden are "readily removable." As a practical matter, however, most of those infilled seats are permanently assigned to ambulatory patrons and the infilled wheelchair spaces are not available for purchase or use by patrons in wheelchairs.

██ Defendant argues that wheelchair users were given an opportunity to buy season tickets before the arena opened, but declined to do so. While that is true, defendant's ADA obligations were not forever satisfied merely by a one-time-offer, before the arena opened, to sell the wheelchair spaces on a season ticket (or longer) basis to persons with disabilities. The duty to ensure that the Rose Garden is accessible to persons with disabilities is a continuing obligation. On the other hand, the ADA ordinarily does not require (as opposed to allow [11]) an arena operator to give persons with disabilities a special right to purchase tickets for events if comparable tickets would not be available to a person without disabilities (although there may be exceptions, *e.g.*, as a remedy for past discrimination, or perhaps if the disability required that individual to sit in a particular location in order to obtain the same benefits as an ambulatory person).

Ultimately, DOJ and the Access Board need to explain in greater detail how the ADA and the Title III regulations apply to infilling and ticket sale policies at sporting events. For now, this court must interpret and apply, as best it can, the rules that do exist. Of paramount importance is that any standard of conduct be one that can readily be administered by arena operators without intervention by the federal courts. This court has no intention of assuming the role of

a "ticketmaster" deciding who will receive tickets for each event at the Rose Garden.

██ The court declines to adopt DOJ's proposal that no wheelchair spaces can be infilled until every conventional seat in the arena has been sold out. Such a policy could be defended as giving public accommodations a strong incentive to encourage attendance by wheelchair users, lest the seats be left vacant, unlike the present situation where arena operators have every reason to discourage attendance by wheelchair users so they can infill wheelchair locations with much larger numbers of conventional seats. However, it would also give preferential treatment to wheelchair users, since they could still purchase the best seats in the house long after an ambulatory patron could no longer do so. This court is unwilling to assume such a construction was intended absent more explicit language in the text of the regulation or the commentary explaining it. There also is considerable potential for abuse if tickets for wheelchair spaces are still available long after comparable tickets have been sold out. Defendant should not be placed in the position of having to decide whether an individual really needs a wheelchair space or is just trying to get into an otherwise sold out event (assuming defendant even has the authority to make such a determination or to demand proof of need, a question that I do not decide today).

Instead, after considering the governing law, the facts of this particular case, and the various ideas and concerns raised by the parties and by DOJ, the court will order the following remedy for the present conditions at the Rose Garden.

██ First, no wheelchair spaces may be infilled for a particular game or other event unless all conventional seats in that ticket category have already been sold.[12] If an ambulatory patron could still purchase a ticket for a conventional seat, then wheelchair

---

11. Since the ADA does not require that a public accommodation infill wheelchair spaces, a public accommodation could voluntarily choose to forego infilling and reserve some wheelchair spaces solely for use by persons with disabilities.

12. "Sold" means retail sale to the general public, as opposed to a block transfer or sale of tickets to a ticket broker for resale. Otherwise, an event might nominally be "sold out" even though all tickets for the event had simply been transferred to a ticket broker for resale to the public.

users must be able to purchase tickets for comparable wheelchair spaces.

■ Second, wheelchair users must have the same opportunity as other patrons to use tickets acquired through the secondary market (*e.g.*, going to the game with a friend who has an extra ticket, using a complimentary ticket obtained from an employer or family member, sharing a season ticket, purchasing a ticket through the classifieds, *etc.*). Accordingly, although wheelchair users are strongly encouraged to purchase tickets for wheelchair spaces when available, if an individual needing a wheelchair space arrives at a game or other event with a ticket for a conventional seat, that individual must be seated in an equivalent or better wheelchair space. Pursuant to Standard 4.33.3, companion seats shall be provided for any ambulatory companions of the wheelchair user who have tickets for adjacent seats.[13] Wheelchair users who have obtained a ticket for a conventional seat for a specific game or event will be encouraged, though not required, to give advance notice of their need to be relocated to a wheelchair space.[14] Information shall be furnished to the local disabled community advising them of these policies, and of a telephone number that individuals can call for information concerning these policies or to give advance notice that they will need a wheelchair space for a particular event.

■ Third, wheelchair users shall have the same rights as other patrons to purchase season tickets, or to be included on waiting lists, participate in drawings, or otherwise compete for any season tickets that become available. If the only available season tickets in a particular location are conventional seats, then the purchaser must be offered equivalent or better season tickets in a wheelchair location at the same price.

■ The court is concerned that the "equivalent or better" option could be used to cluster all wheelchair users in just a few locations, thereby freeing up all remaining wheelchair locations to be infilled with conventional seats. Such a practice might well violate the rule that wheelchair spaces must be dispersed throughout the arena in a manner that is roughly proportionate to the overall distribution of seating. *Cf. Independent Living*, 982 F.Supp. at 708–09, 716. It also would deny wheelchair users and their companions a choice of sightlines comparable to that which is available to ambulatory patrons. While a public accommodation may infill wheelchair spaces with readily removable seats when the wheelchair spaces are not needed to accommodate wheelchair users, it must do so in a manner that ensures that an appropriate selection of wheelchair spaces remain available to accommodate those wheelchair users who do attend the event. Moreover, since there is not universal agreement on what is the "best" ticket or sight line, the preferences of the ticket holder shall be considered in determining what is an "equivalent or better" wheelchair space.[15]

■ The practice of "steering" is prohibited. "Steering" means falsely telling wheelchair users that tickets for wheelchair spaces either are unavailable or are available only in certain locations, such as Level 7 or a particular wheelchair location, with the intent of maximizing the number of wheelchair locations that can be infilled with conventional seats. There are, of course, circumstances in which an event promoter may elect not to sell tickets in certain sections of the arena, particularly when attendance for the event is expected to be light. That is not a prohibited practice, so long as tickets to those sections are similarly unavailable to ambulatory patrons and there are an adequate number of

13. While there is a small (but nonetheless real) potential for abuse, this requirement is necessary so a wheelchair user can attend an event with ambulatory companions. If abuse becomes a serious problem, the court will consider appropriate modifications to address those concerns.

14. Finding a suitable wheelchair location may be an inconvenience for defendant or the event promoter, but any difficulty is largely a consequence of the choice made to increase profits by infilling wheelchair spaces; the fewer spaces that are infilled, the easier it will be to find a suitable wheelchair location.

15. The word "considered" means just that. It does not give the ticket holder a license to make unreasonable demands.

wheelchair spaces properly distributed in the remainder of the arena.

Defendant has insisted that employee error is to blame for any instances of "steering" at the Rose Garden. Defendant shall take necessary measures to ensure that all persons under its control involved in ticket sales are properly trained so that such mistakes will not recur.

Defendant shall take necessary measures to ensure that all persons staging an event at the Rose Garden comply with each of the foregoing requirements.

### 3. Tickets for Modified Aisle Seats

#### a. Findings of Fact

1. On paper, the Rose Garden has 191 modified aisle seats in the basketball configuration (ignoring, for the moment, the question of whether those modified aisle seats comply with the Title III requirements).

2. Modified aisle seats are not infilled, since they are similar in many respects to conventional seats and can readily be used by patrons without mobility impairments.

3. A substantial percentage of tickets for modified aisle seats are sold on a season ticket (or longer) basis to persons who do not have an impairment requiring use of a modified aisle seat and consequently are not available for purchase or use by persons who actually require a special seat.

4. Tickets for many of the remaining modified aisle seats also have been sold—either on a per-game basis or as part of a multi-game package—to persons who do not need a special seat. These seats likewise are not available for use by persons who actually require a special seat.

5. Defendant ordinarily retains 2 modified aisle seats (out of 191) as "trouble seats," e.g., if the need for a special seat is first determined when the ticket holder arrives at the arena, or if a season ticket holder injures a leg and is unable to sit in his or her usual seat.

#### b. Conclusions of Law

 The Title III design Standards mandate that defendant provide 191 modified aisle seats suitable for use by persons with mobility impairments. The question presented here is whether those seats must actually be available for use by persons with disabilities, or whether it is sufficient that defendant built 191 seats with removable armrests. Common sense suggests that the first interpretation is correct.

The design Standards are silent regarding the actual use of those seats, but that is not surprising since the day-to-day use of the seats is not so much a "design" issue as an operational one. The latter topic is addressed by other Title III regulations. For instance, 28 CFR § 36.302 requires a public accommodation to "make reasonable modifications in policies, practices, or procedures, when the modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities ..."

An analogous example is a hotel that is required to have a minimum percentage of rooms accessible to guests in wheelchairs. The purpose of that requirement would be frustrated if those rooms were rented on a first-come, first-served basis without regard to whether the guest required an accessible room. Section 36.302 would require the hotel to modify its procedures to set aside accessible rooms for use by persons with disabilities, at least so long as the hotel still had comparable rooms available for rent to ambulatory guests. *Cf.* DOJ Technical Assistance Manual ("TAM") (November 1993) at 24 (§ 111–4.2100, Illus.2).

 Similarly, modified aisle seats must be available to those who actually need them. That does not mean all 191 modified aisle seats must be reserved exclusively for use by persons with disabilities. For now, there is not sufficient demand for those seats at the Rose Garden to justify such a requirement (even assuming it was otherwise appropriate). What it does mean, however, is that in selling tickets for these special seats priority must be given to persons who actually require a modified aisle seat, at least while there are still conventional seats available in that ticket category. In addition, while tickets for modified aisle seats may be sold to ambulatory patrons (in the absence of de-

mand from persons with disabilities), a sufficient number of modified aisle seats must be retained to accommodate ticket holders who arrive at the event needing a modified aisle seat. If an individual needing a modified aisle seat arrives at a game or other event with a ticket for a conventional seat, that individual must be seated in an equivalent or better modified aisle seat.[16] The preferences of the ticket holder shall be considered in determining what is an "equivalent or better" modified aisle seat. As with the wheelchair spaces, persons with mobility impairments will be encouraged, but not required, to give advance notice of their need to be relocated to a modified aisle space. Information shall be furnished to the local disabled community advising them of these policies, and of a telephone number that individuals can call for information concerning these policies or to give advance notice that they will need a modified aisle seat for a particular event.

Persons needing modified aisle seats shall have the same rights as other patrons to purchase season tickets, or to be included on waiting lists, participate in drawings, or otherwise compete for any season tickets that may become available. If—because the modified aisle seats in a section have been sold to ambulatory patrons—the only available season tickets in a particular location are conventional seats, then the purchaser must be offered season tickets for a modified aisle seat in an equivalent or better location at the same price.

Defendant shall take necessary measures to ensure that all persons under its control involved in ticket sales are properly trained and that all persons staging an event at the Rose Garden comply with each of the foregoing requirements.

---

**16.** At times, it may be necessary to offer inducements to other patrons to be "bounced" from an aisle seat in order to make room for someone who needs a special seat. The airlines have employed such procedures for many years, *e.g.,* by offering a free ticket to a passenger who volunteers to be bumped. The court will leave these logistical matters in the capable hands of the arena operators and event promoters.