Robin FORTYUNE, Plaintiff–Appellee,

v.

AMERICAN MULTI–CINEMA, INC., Defendant–Appellant.

No. 02–57013.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 3, 2004.

Filed April 14, 2004.

Gregory F. Hurley, Greenberg Traurig LLP and Stacey L. Jaramillo, Irvine, CA, for the defendant-appellant.

Russell C. Handy, Center for Disability Access, San Diego, CA, for the plaintiff-appellee.

Before: BROWNING, REINHARDT, and KIM WARDLAW, Circuit Judges.

WARDLAW, Circuit Judge:

Robin Fortyune is a C–5 quadriplegic who requires both a wheelchair and an aide to attend movie theaters. Fortyune and his wife Felicia attempted to view American Multi–Cinema's ("AMC") screening of the film *Chicken Run,* but were prevented from doing so when a man and his son refused to vacate the wheelchair "companion seats" that they occupied. AMC's manager informed the Fortyunes that, under company policy concerning the use of wheelchair companion seats at sold-out screenings, he could not require the man and his son to change seats. Spurned and publicly humiliated, the Fortyunes left the theater—Mrs. Fortyune in tears.

At issue is whether Fortyune had standing to, and in fact did, establish a viable claim of discrimination under the Americans with Disabilities Act ("ADA"). We must also decide whether the district court's injunction requiring AMC to ensure that wheelchair-bound patrons be permitted to sit beside their companions affords such patrons preferential treatment or runs afoul of the specificity requirements set forth in Federal Rule of Civil Procedure 65(d). As explained more fully below, we conclude that Fortyune properly brought and established a claim under the ADA and that the district court's injunction is both nondiscriminatory and adequately specific. We, therefore, affirm the district court's order granting the Fortyunes summary judgment and injunctive relief.

## BACKGROUND

Viewed in the light most favorable to AMC, *see Oliver v. Keller,* 289 F.3d 623, 626 (9th Cir.2002), the record reveals the following facts:

On Sunday, June 25, 2000, the Fortyunes sought to attend the 4:45 p.m. screening of *Chicken Run* in Auditorium 12 of AMC's Rolling Hills 20 Theater ("the Theater") in Torrance,. California. The Fortyunes' attempted to view *Chicken Run* four days after its release, during the film's official opening weekend. Because of this, and due in part to the fact that *Chicken Run* then ranked as the second-highest grossing film in the nation, the screening was well-attended and AMC "over-sold" tickets to view it.

Fortyune and his wife arrived at the Theater approximately twenty minutes prior to showtime. At that point, the auditorium had not yet filled with patrons.

Auditorium 12 provides four wheelchair spaces, each of which is adjoined by a companion seat. *See infra* Appendix A. A sign on the back of these seats clearly indicates that they are intended for use by the companions of individuals with disabilities.[1] Nonetheless, when Fortyune and his wife entered the Theater, a man and his son, who appeared to be neither disabled nor accompanying a wheelchair-bound patron, occupied two of the companion seats. Mrs. Fortyune noted the signs and asked the man to sit elsewhere. When he refused, Mrs. Fortyune sought

---

1. The sign reads: "NOTICE—This seat is designated as COMPANION SEATING for our disabled guests, per ADA guidelines. It may be necessary to ask non-disabled patrons to move."

the assistance of the Theater's manager, Jason Kulbel, who also requested that the man change seats. The man refused again, indicating that he and his son had arrived early so that they could sit together. By this time the film had almost started and all of the nearby seats had filled. In accordance with the written policy set forth in AMC's manager training manual,[2] Kulbel informed the Fortyunes that, because the movie was sold-out, he could not require the man to vacate the companion seat. After refusing Kulbel's offer to view another film, but accepting two free passes, the Fortyunes left the Theater.

Despite this unfavorable experience, the Fortyunes continue to view films at the Theater with regularity. On average, the Fortyunes attend three to four films each week. They now arrive at the Theater 45 minutes before a film's screening, however, to increase the likelihood that an empty companion seat will be available. Since the events of June 25, 2000, the Fortyunes have not encountered any seating problems at the Theater.

On April 14, 2002, Mr. Fortyune filed a First Amended Complaint against AMC, alleging discrimination against persons with disabilities in violation of the ADA and several California statutes. After two failed attempts at mediating a settlement, both parties moved for summary judgment. On October 22, 2002, the district court issued an order granting Fortyune's motion for summary judgment, denying AMC's motion for summary judgment, and granting injunctive relief. The district court's injunction reads:

Defendant must modify its policies regarding companion seating to ensure that a companion of a wheelchair-bound patron be given priority in the use of companion seats. A noncompanion may sit in a companion seat when the seating is not needed by a wheelchair-bound patron and his or her companion. However, if a noncompanion is seated in a companion seat needed by a wheelchair-bound patron and his or her companion, Defendant must ensure that the companion seat is made available to the companion, so long as the wheelchair-bound patron and his or her companion arrive at the wheelchair seating area at least ten (10) minutes prior to show time.

AMC timely appealed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1), over this interlocutory appeal from the district court's order granting Fortyune a permanent injunction.

"We review a summary judgment [order] granting or denying a permanent injunction for abuse of discretion and application of the correct legal principles." *EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1544 (9th Cir.1987). "Otherwise, we review *de novo* a grant of summary judgment." *Midgett v. Tri–County Metro. Transp. Dist.*, 254 F.3d 846, 849 (9th Cir.2001) (citing *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.1995)). Summary judgment is appropriate "if the pleadings, depositions, answers to inter-

---

**2.** The manual provides the following guidelines for companion seating:

In situations in which the auditorium is legitimately "sold out," companions of guests using wheelchairs will be exposed to the same risk of less desirable seating as non-disabled couples who are sold "single" seats. In a sold out situation, everyone

shares the same risk of being unable to sit together.

The manual also provides that, at the discretion of the manager, free passes may be offered to guests as an incentive to move. AMC suggests that it offered free passes to the man occupying the companion seat.

rogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Our task is to "determine whether the evidence, viewed in a light most favorable to the non-moving party, presents any genuine issues of material fact and whether the district court correctly applied the law." *Warren*, 58 F.3d at 441.

## DISCUSSION

"Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001). The Act responds to what Congress described as a "compelling need" for a "clear and comprehensive national mandate" to eliminate discrimination against disabled individuals. *Id.* at 675, 121 S.Ct. 1879. "To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodations (Title III)." *Id.* (internal citations omitted).

Title III of the ADA prohibits discrimination in public accommodations and establishes a "general rule" that:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).[3] The ADA defines discrimination to include:

> [A] failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations....

*Id.* § 12182(b)(2)(A)(ii). Title III also prohibits places of public accommodation from denying disabled individuals "the opportunity ... to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity." *Id.* § 12182(b)(1)(A)(i).

Congress entrusted the Attorney General with the responsibility of promulgating Title III's implementing regulations. *See* 42 U.S.C. § 12186(b) (directing the Attorney General to "issue regulations ... to carry out the provisions of" Title III). Congress further provided that these implementing regulations must be consistent with the minimum guidelines issued by the Architectural and Transportation Barriers Compliance Board ("the Access Board"). *See* 42 U.S.C. § 12186(c). The Access Board provided a notice and comment period for its proposed ADA guidelines in 1991, *see* 56 Fed.Reg. 2296-01 (Jan. 22, 1991), and issued its final ADA Accessibility Guidelines for Buildings and Facilities ("ADAAG") later that year. *See* 56 Fed. Reg. 35,408 (July 26, 1991) (codified at 36 C.F.R. Pt. 1191, App. A). The Attorney General adopted, *in toto*, the Access Board's ADAAG as the "Standards for Accessible Design." *See* 28 C.F.R. Pt. 36, App. A. These standards lay out the technical structural requirements of places of

---

**3.** Movie theaters are "public accommodations" under the ADA. *See* 42 U.S.C. § 12181(7)(C) (defining "public accommodation" to include "motion picture houses").

public accommodation and are applicable "during the design, construction, and alteration of such buildings and facilities ... under the [ADA]." *See id.* App. A, § 1. With this framework in mind, we turn to AMC's assertions of error.

## I. Standing

"It goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons,* 461 U.S. 95, 101, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). "[T]o satisfy Article III's case or controversy requirement, [Fortyune] needs to show that [ ]he has suffered an injury in fact, that the injury is traceable to the challenged action of [AMC], and that the injury can be redressed by a favorable decision." *Bird v. Lewis & Clark College,* 303 F.3d 1015, 1019 (9th Cir.2002), *cert. denied,* 538 U.S. 923, 123 S.Ct. 1583, 155 L.Ed.2d 314 (2003). In the context of injunctive relief, Fortyune must additionally demonstrate "a sufficient likelihood that he will again be wronged in a similar way[.]" *Lyons,* 461 U.S. at 111, 103 S.Ct. 1660. That is, he must establish a "real and immediate threat of repeated injury." *O'Shea v. Littleton,* 414 U.S. 488, 496, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). While "past wrongs do not in themselves amount to [a] real and immediate threat of injury necessary to make out a case or controversy," *Lyons,* 461 U.S. at 103, 103 S.Ct. 1660, "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea,* 414 U.S. at 496, 94 S.Ct. 669.

██ Because AMC concedes that Fortyune satisfies the general standing requirements, our inquiry focuses on his ability to demonstrate a "real and immediate threat" that the injury will be repeated. Specifically, AMC contends that Fortyune

does not possess standing to seek an injunction because his experience at the Theater on June 25, 2000, was unique and is unlikely to recur.

We disagree. As we have previously noted, a plaintiff may "demonstrate that [an] injury is likely to recur" by showing "that the defendant had, at the time of the injury, a written policy, and that the injury 'stems from' that policy." *Armstrong v. Davis,* 275 F.3d 849, 861 (9th Cir.2001). "[W]here the harm alleged is directly traceable to a written policy ... there is an implicit likelihood of its repetition in the immediate future." *Id.* Here, AMC maintains a written policy that fails to ensure that wheelchair-bound patrons are able to sit with their companions when the screening in question is soldout. Fortyune's injury stems directly from this policy and, as a consequence, is likely to recur. *See id.* The facts underlying his past injury demonstrate as much.

On the night of June 25, 2000, Fortyune and his wife arrived at the Theater approximately twenty minutes early. Despite their early arrival, the Fortyunes were unable to secure the seating necessary to attend the viewing, *i.e.,* a companion seat. The individual who refused to vacate the seat did so not because the Theater was full, but rather because "[the companion seat] is where he and his son wanted to sit and ... they did not want to move." Although one would hope that this individual is not representative of the movie-going public, the wrong he engendered provides "evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea,* 414 U.S. at 496, 94 S.Ct. 669.

As a consequence of AMC's policy, Fortyune can be denied the opportunity to attend a sold-out film screening, regardless of how early he arrives, provided only that a single non-companion individual re-

fuses to change seats. Since there are only four companion seats in the theater, AMC's policy denies Fortyune an opportunity to sit with his companion equal to that enjoyed by ambulatory patrons. Given this, and the frequency with which Fortyune continues to attend the Theater, the possibility of his injury recurring cannot be said to be so remote as to preclude standing. Rather, AMC's ongoing policy coupled with Fortyune's past injury establishes a "real and immediate threat" of his injury occurring again. *See Pickern v. Holiday Quality Foods, Inc.*, 293 F.3d 1133, 1138 (9th Cir.2002) (stating that "a plaintiff who is threatened with harm in the future because of existing ... noncompliance with the ADA suffers 'imminent harm' "), *cert. denied*, 537 U.S. 1030, 123 S.Ct. 559, 154 L.Ed.2d 445 (2002). We, therefore, conclude that the district court did not err in determining that Fortyune possessed standing to seek an injunction against AMC.

## II. Fortyune Established a Claim Under the ADA

■ Nor did the district court err in concluding that Fortyune established a claim under the ADA. An individual alleging discrimination under Title III must show that: (1) he is disabled as that term is defined by the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; (3) the defendant employed a discriminatory policy or practice; and (4) the defendant discriminated against the plaintiff based upon the plaintiff's disability by (a) failing to make a requested reasonable modification that was (b) necessary to accommodate the plaintiff's disability. *PGA Tour*, 532 U.S. at 683 n. 38, 121 S.Ct. 1879; *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 307 (1st Cir.2003); *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1027 (8th Cir.1999); 42 U.S.C. §§ 12182(a) and (b)(2)(A)(ii). If the plaintiff makes such a showing, the

defendant must make the requested modification unless it proves that doing so would alter the fundamental nature of its business. *See PGA Tour*, 532 U.S. at 683 & n. 38, 121 S.Ct. 1879. Because no party disputes that Fortyune is disabled or that AMC is a place of public accommodation, our analysis begins with a determination of whether AMC instituted a policy or practice that was discriminatory in effect.

### A. Discriminatory Policy or Practice

■ It is uncontested that Fortyune is a quadriplegic. As the district court observed, he "cannot and does not attend movies without his wife or another companion." Stated differently, the presence of his wife is a condition precedent to Fortyune's "enjoyment of the goods, services, facilities, privileges, advantages, [and] accommodations of [the AMC theater]." 42 U.S.C. § 12182(a). Accordingly, AMC's stated policy of failing to ensure that a wheelchair-bound patron and his or her companion are seated together has a discriminatory effect in practice.

### B. Failure to Modify Policy

■ To establish a violation of Title III, however, Fortyune must also show that AMC discriminated against him by failing to make a reasonable modification in "policies, practices, or procedures," 42 U.S.C. § 12182(b)(2)(A)(ii), necessary to accommodate his disability. If Fortyune makes such a showing, AMC can avoid liability if it proves that the requested modification would fundamentally alter the nature of the public accommodation. *PGA Tour*, 532 U.S. at 683 n. 38, 121 S.Ct. 1879; 28 C.F.R. § 36.302 ("A public accommodation shall make reasonable modifications in policies, practices, or procedures, when the modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals

with disabilities, unless the public accommodation can demonstrate that making the modifications would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations.").

### 1. The Requested Modification Is Necessary

AMC does not contest that Fortyune requires an aide or companion to attend and enjoy movies at the Theater. Although we view the facts in the light most favorable to AMC, we must also independently review the record as a whole and may accept uncontested facts found therein. See Suzuki Motor Corp. v. Consumers Union of United States, Inc., 330 F.3d 1110, 1132 (9th Cir.), cert. denied, — U.S. —, 124 S.Ct. 468, 157 L.Ed.2d 373 (2003); Cf. Retail Clerks Union Local 648 v. Hub Pharmacy, Inc., 707 F.2d 1030, 1037 (9th Cir.1983). Because Fortyune requires an attendant to enjoy the viewing of a film, the modification that he requested, i.e., that AMC ensure that his companion could be seated next to him, was necessary.

### 2. The Requested Modification Is Reasonable

"Although neither the ADA nor the courts have defined the precise contours of the test for reasonableness, it is clear that the determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." Staron v. McDonald's Corp., 51 F.3d 353, 356 (2d Cir.1995); Wong v. Regents of the Univ. of Cal., 192 F.3d 807, 818 (9th Cir. 1999) (stating that "the issue of reasonableness depends on the individual circumstances of each case, this determination requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might [be necessary to ensure his ability to enjoy a public accommodation]"). The standard for reasonableness under the ADA does not differ from the one employed under the Rehabilitation Act, 29 U.S.C. § 794. Wong, 192 F.3d at 816 n. 26 ("Although Title [III] of the ADA uses the term 'reasonable modification' rather than 'reasonable accommodation,' these terms do not differ in the standards they create."). In the context of the Rehabilitation Act, the Supreme Court has stated that an "[a]ccommodation is not reasonable if it ... imposes 'undue financial and administrative burdens'...." School Bd. of Nassau County v. Arline, 480 U.S. 273, 288 n. 17, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987); see also Chalk v. United States Dist. Court Cent. Dist. of Cal., 840 F.2d 701, 705 (9th Cir.1988). Given the record before this court, Fortyune's requested modification was reasonable.

Fortyune asked both AMC and the district court to ensure that he could be seated next to his wife or another companion at the Theater. His request, as well as the district court's injunction, requires that AMC take steps to remove from a companion seat any person who is not the companion of a wheelchair-bound patron and who refuses to vacate that seat despite being asked to do so. Although AMC strenuously protests that this relief is "draconian" in that it would require AMC to "forcibly evict the non-disabled," this concern is overstated.

As a public accommodation, AMC is responsible—on a daily basis—for ensuring that its patrons act reasonably and responsibly with regard to an array of company, state, and federal laws or policies. For example, AMC must keep its theaters' aisles clear of patrons during the screening of a film so as to comply with state fire

**1084**

regulations. *See* Cal. Admin. Code tit. 19, § 3.11(d) ("Aisles shall not be occupied by any person for whom seating is not available."). If an individual refuses to move from the aisle, AMC must nonetheless ensure compliance. Similarly, AMC must assure conformity with local and state smoking ordinances, as well as its own internal policies regarding patrons who talk, use cell phones, or otherwise disturb others during a film's screening. While resort to forcible removal is seldom required, AMC conceded at oral argument that it has had the occasion to call upon its own security force, or that of the local police authorities, to ensure compliance with the law or its own internal policies.

Fortyune's requested modification requires no less and no more of AMC. AMC must adopt a policy that ensures companion seating will be made available to the individuals for whom they are designed: the companions of wheelchair-bound patrons. This is required even if a person not accompanying a wheelchair-bound patron refuses to vacate a companion seat at the request of a wheelchair-bound patron. AMC agrees that such events are exceedingly uncommon, so enforcement of the ordered policy will incur neither excessive financial costs nor an extensive administrative burden. *See Arline*, 480 U.S. at 288 n. 17, 107 S.Ct. 1123. In the rare event that an individual will not move seats, it is reasonable to require that AMC ensure that a wheelchair-bound patron be permitted to sit next to his or her companion as contemplated by the ADA and its implementing regulations. *See PGA Tour*, 532 U.S. at 690, 121 S.Ct. 1879 (noting that the ADA advances a "basic requirement that the need of a disabled person be evaluated on an individual basis"). Everyday AMC enforces policies, both internal and state-directed, that may require resort to the proper authorities. Fortyune's requested policy modification, like these others, is not unreasonable on the sole basis of this potentiality.

### 3. The Modification Does Not Fundamentally Alter the Theater

■ *Fortyune's modification also does not fundamentally* alter the nature of the services provided by the Theater. *See id.* at 682, 121 S.Ct. 1879. All aspects of the Theater and its policies survive the requested relief intact, save one: AMC must now ensure that companion seats are available to the companions of wheelchair-bound patrons until ten minutes prior to showtime, even if a person not accompanying a wheelchair-bound patron refuses to move. This change will have a negligible effect—if any—on the nature of the service provided by the Theater: screening films. *See Martin v. PGA Tour, Inc.*, 204 F.3d 994, 1001 (9th Cir.2000). While the individual who is made to move seats will experience the film in a different manner (*i.e.*, from a different location in the Theater), this shift is modest and does not rise to the level of a "fundamental alteration" of the Theater itself.

### C. The ADA Accessibility Guidelines

■ As an alternative to the foregoing analysis, AMC argues that to prevail on his ADA claim "Fortyune must establish that the Theater fails to comply with the specific requirements of the ADAAG." But despite its dogged insistence on this contention, AMC is unable to cite a single authority advancing its position.

Instead, AMC draws our attention to two non-precedential cases that rely for decision upon the ADAAG, but in the context of the construction and design of movie theaters. *See Lara v. Cinemark USA, Inc.*, 207 F.3d 783, 786 (5th Cir.2000); *Or. Paralyzed Veterans of America v. Regal Cinemas, Inc.*, 142 F.Supp.2d 1293, 1295 (D.Or.2001), *rev'd*, 339 F.3d 1126 (9th Cir. 2003). We agree with *Lara* and *Oregon Paralyzed Veterans* that an examination of

the ADAAG—which "sets guidelines for accessibility to places of public accommodation ... to be applied during the design, construction and alteration of such buildings," 28 C.F.R. Part 36 App. A—is necessary in cases that involve the *design* of a public accommodation under the ADA (*e.g.*, a theater's placement of wheelchair spaces). But in cases such as Fortyune's, which concern a public accommodation's policy regarding the *use* of that design (*e.g.*, the use and availability of a companion seat), the provisions of the ADAAG are not controlling. *See Independent Living Resources v. Oregon Arena Corp.*, 1 F.Supp.2d 1159, 1172 (D.Or.1998) ("The [ADDAG is] silent regarding the actual use of those seats, but that is not surprising since the day-to-day use of the seats is not so much a 'design' issue as an operational one."). It is, thus, understandable that neither *Lara* nor *Oregon Paralyzed Veterans* advances AMC's proposed rule: that ADA plaintiffs must prove the defendant contravened a "specific requirement of the ADAAG," to establish a violation of the ADA. As discussed above, the task of defining a plaintiff's burden under the ADA is handled by 42 U.S.C. § 12182.[4] *See Independent Living*, 1 F.Supp.2d at 1172.

## D. Fortyune Established a Claim Under the ADA

In light of the foregoing, we find that Fortyune established a claim under the ADA. He sufficiently demonstrated that: (1) he is disabled under the Act; (2) AMC operates a place of public accommodation; (3) AMC employed a discriminatory policy or practice; and (4) AMC discriminated against him based upon his disability by (a) failing to make a requested reasonable modification that was (b) necessary to accommodate his disability. *See PGA Tour*, 532 U.S. at 683 n. 38, 121 S.Ct. 1879; *Dudley*, 333 F.3d at 307; *Amir*, 184 F.3d at 1027; 42 U.S.C. § 12182(a) and (b)(2)(A)(ii). AMC has not shown that making the requested modification would fundamentally alter the nature of its business. *PGA Tour*, 532 U.S. at 683 n. 38, 121 S.Ct. 1879. AMC's refusal to ensure that Fortyune could sit beside his wife denied him "the opportunity ... to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity," 42 U.S.C. § 12182(b)(1)(A)(i), thereby denying him "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of [the Theater]." 42 U.S.C. § 12181(a). Indeed, "[AMC's] violation resulted in the very discrimination the [ADA] seeks to prevent: it denied [a disabled individual] access to [a] public accommodation [ ]." *Long v. Coast Resorts, Inc.*, 267 F.3d 918, 923 (9th Cir.2001). The district court, therefore, properly determined that Fortyune established an ADA violation.

---

**4.** This is not to say that the ADAAG is irrelevant. Policies effectuating the ADAAG may be required to fulfill the statutory purpose of 42 U.S.C. § 12182. For instance, the ADAAG requires that hotels provide a minimum number of accessible rooms and rooms with roll-in showers. *See* 28 U.S.C. Pt. 36, App. A, Guideline 9.1.2. The regulation implementing 42 U.S.C. § 12182(b)(2)(A)(ii), illustrates that a hotel does *not* fulfill its obligations under the ADA simply by complying with this design and construction guideline. In addition, "a hotel may need to adopt a policy of keeping an accessible room unoccupied until an individual with a disability arrives at the hotel...." 28 C.F.R. Pt. 26, App. B, § 36.302. Policies ensuring access to the wheelchair companion seats required under ADAAG Guideline 4.33.3 may similarly further the statutory purpose of 42 U.S.C. § 12182. *See* H.R. Rep. 101–485 II, at 102, *reprinted at* 1990 U.S.C.C.A.N. 303, 385 (explaining that the ADA ensures that wheelchair-bound patrons should not be "forced to separate from family or friends during the performance").

## III. The Injunction's Alleged Preferential Treatment to the Disabled

■ Fortyune's injunctive relief does not result in preferential treatment to the disabled. Rather, by ensuring that Fortyune may sit with his wife or another companion, it merely requires the Theater to make a reasonable accommodation to permit a wheelchair-bound patron to attend and enjoy the Theater. AMC's argument to the contrary is founded upon a misconception of both the ADA and its implementing regulations.

The ADA requires places of public accommodation "to make reasonable modifications in policies, practices, or procedures" when necessary to afford goods and services to disabled individuals. 42 U.S.C. § 12182(b)(2)(A)(ii). Indeed, the ADA defines discrimination as a public accommodation treating a disabled patron the same as other patrons despite the former's need for a reasonable modification. *See id.* For example, unlike non-disabled patrons, disabled individuals are permitted to bring service animals into public accommodations. *See* 28 C.F.R. § 36.302(c). Such concessions, while certainly "preferential" in the sense that they confer upon disabled patrons a benefit denied to others, are not only contemplated by the ADA, they are required. *See id.* The ADA's implementing regulations are designed "to place those with disabilities on an equal footing, not to give them an unfair advantage." *Kornblau v. Dade County,* 86 F.3d 193, 194 (11th Cir.1996). *See also Riel v. Elec. Data Sys. Corp.,* 99 F.3d 678, 681 (5th Cir.1996) (noting that "an employer who treats a disabled employee the same as a non-disabled employee may violate the ADA"). That is precisely what Fortyune's injunction accomplishes. Because Fortyune's sought-after remedy merely gives force to a reasonable accommodation, AMC's protestation that the injunction is unduly preferential fails as a matter of law.[5]

## IV. The Specificity Requirements of Fed.R.Civ.P. 65(d)

■ The district court's injunction is adequately precise and, as a result, does not run afoul of the specificity requirements set forth in Fed.R.Civ.P. 65(d). Rule 65(d) requires that

> [e]very order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained....

*Id.* "The Supreme Court has explained that 'one basic principle built into Rule 65 is that those against whom an injunction is

---

**5.** AMC's plea of inequity also fails as a matter of simple mathematics. Imagine a hypothetical two-row theater with a back row of 8 adjoining non-wheelchair accessible seats and a front row of 8 spaces/seats for wheelchair-bound patrons and their companions, *i.e.,* 4 wheelchair spaces and 4 adjoining wheelchair companion seats. *See, e.g., infra* Appendix A. Assuming that only companions to wheelchair-bound patrons may sit in the 4 front row seats, the total number of paired seats available to a couple attempting to sit together in the back row is 7 (*e.g.,* the couple can sit beside each other in the first 2 contiguous seats of the back row, creating the first pairing, and then move down the row together—

one seat each per move—6 more times). In contrast, a wheelchair-bound patron and his or her companion have only 4 possible paired-seating options available. Non-wheelchair-bound patrons, therefore, have almost twice the number of paired-seating options than wheelchair-bound theater-goers.

Of course, the reality is that theaters tend to have a far greater number of non-companion seats than wheelchair companion seats. Accordingly, wheelchair-bound patrons and their companions who wish to sit together are generally at a significantly greater disadvantage than the 7 to 4 ratio shown in this example.

issued should receive fair and precisely drawn notice of what the injunction actually prohibits.' " *Union Pac. R.R. v. Mower*, 219 F.3d 1069, 1077 (9th Cir.2000) (quoting *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 444, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974)). "[T]he specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974). Nonetheless, "[w]e will not set aside injunctions under Rule 65(d)'unless they are so vague that they have no reasonably specific meaning.' " *United States v. V-1 Oil Co.*, 63 F.3d 909, 913 (9th Cir.1995) (quoting *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1297 (9th Cir.1992)).

The district court's injunction satisfies Rule 65(d)'s specificity requirements. It demands that AMC "modify its policies regarding companion seating to ensure that a companion of a wheelchair-bound patron be given priority in the use of companion seats ... [up until] ten (10) minutes prior to show time." This order provides "fair and precisely drawn notice of *what* the injunction actually prohibits." *Granny Goose*, 415 U.S. at 444, 94 S.Ct. 1113 (emphasis supplied). Indeed, the injunction could not have been much clearer in describing what AMC must do to comply with its dictates.

AMC's argument to the contrary is grounded upon the misconception that the district court must also elucidate *how* to enforce the injunction. But Rule 65(d) does not require this of the district court. Rather, the Rule compels the court to "describe in reasonable detail ... the act or acts sought to be restrained." Fed. R.Civ.P. 65(d). The district court's injunction is quite clear on this front: it dictates that AMC must ensure that companions to wheelchair-bound patrons be able to sit with their companions until ten minutes before the film begins. The injunction is not, therefore, in violation of Rule 65(d), even though it declines to provide AMC with explicit instructions on the appropriate means to accomplish this directive. *Cf. Independent Living*, 1 F.Supp.2d at 1173 n. 16 (leaving "logistical matters" concerning the implementation of an injunction "in the capable hands of the[defendants]"). Despite the injunction's failure to specify how to comply with its terms, we are confident that AMC is capable of devising such means, particularly in light of the numerous workable suggestions articulated at oral argument. Indeed, it is unclear why AMC seeks specific direction as to the method of compliance with the district court's injunction, except as a means of bolstering its principal position that it should not be required to modify its policy at all; but in light of the numerous theaters owned by AMC and their different physical layouts, we find most appropriate the district court's decision not to impose a specific compliance procedure.

## CONCLUSION

The district court's determination that Fortyune had standing to pursue an injunction was not in error. Nor was it erroneous for the court to conclude that Fortyune established a claim under the ADA warranting injunctive relief. Moreover, the injunction that the district court issued does not result in preferential treatment to the disabled and satisfies Rule 65(d)'s specificity requirements. We, therefore, affirm the district court's order.

**AFFIRMED.**

APPENDIX A