Filed 11/14/23

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JEFFEREY LURNER, | |
| Plaintiff and Appellant, | G061267 |
| v. | (Super. Ct. No. 30-2018-00992342) |
| AMERICAN GOLF CORPORATION et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Gregory H. Lewis, Judge. Affirmed.

Allred, Maroko & Goldberg, Nathan Goldberg; Carpenter & Zuckerman, John Carpenter; Pine Tillett Pine, Norman Pine, and Scott Tillett for Plaintiff and Appellant.

Fisher & Phillips, James J. McDonald, Jr., Lisa L. Peterson, and Megan E. Walker for Defendants and Respondents.

\* \* \*

Plaintiff Jefferey Lurner was a member of Marbella Golf and Country Club (Marbella) where he played golf. Defendants American Golf Corporation and Root'N USA Corporation own and operate Marbella. At some point after plaintiff joined Marbella, he was diagnosed with pulmonary arterial hypertension (PAH). Given this disability, plaintiff claimed he had to drive his golf cart to wherever his ball landed on the golf course. But for safety reasons, Marbella had rules governing where golfers could drive their golf carts. Some of those restrictions applied to all members, including golfers with disabilities. Plaintiff brought the instant action alleging defendants failed to accommodate his disability and denied him full and equal enjoyment of the golf course.

After the case proceeded to trial, the jury returned a verdict in favor of defendants. The jury found defendants did not "discriminate against or deny [plaintiff] full and equal access to and enjoyment of accommodations or advantages or facilities or services at [Marbella] at any time after May 14, 2016." The court subsequently denied plaintiff's motion for judgment notwithstanding the verdict (JNOV) and motion for new trial.

Plaintiff appeals from the judgment and the court's denial of his JNOV motion and motion for new trial. He contends Marbella's relevant policies were facially discriminatory. He also argues there was no substantial evidence to support the verdict, and the court erred by finding defendants modified their policies for plaintiff. Finally, plaintiff claims the court erred by allowing defendants' expert witness to opine on the application of the law to the facts of this case.

We disagree with plaintiff's contentions. Assuming, without deciding, Marbella's policies had a discriminatory effect in practice, there was substantial evidence defendants modified their policies for plaintiff. Any error regarding the testimony of defendants' expert witness also did not result in a miscarriage of justice. We therefore affirm the judgment.

FACTS

*Plaintiff's Complaint*

In 2018, plaintiff filed the operative second amended complaint against defendants alleging violations of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.; ADA), the Unruh Civil Rights Act (Civ. Code, § 51 et seq.),[1] and California Disabled Persons Act (§ 54 et seq.).  According to the complaint, plaintiff was a member of Marbella, which defendants own and operate.  After plaintiff joined Marbella, he was diagnosed with PAH.

Among other things, the complaint alleged plaintiff had to use a golf cart to play golf and access all parts of the golf course at Marbella due to his disability.  But the complaint claimed defendants did not accommodate plaintiff's disability because they restricted the use of golf carts in certain areas of the golf course.  Although plaintiff informed defendants about his disability, the complaint alleged defendants did not change their policies so plaintiff could use a golf cart on all parts of the course.  Defendants also allegedly did not provide plaintiff with a "single rider Golf Cart . . . designed to avoid injury to the course . . . ."  The complaint further claimed defendants did not inform other members that plaintiff had a disability allowing him to use his golf cart on all parts of the course, which resulted in members taunting and humiliating plaintiff.  Likewise, defendants did not send a letter to all employees explaining plaintiff's disability and need for accommodation.  The complaint accordingly alleged defendants prevented plaintiff from full and equal enjoyment of Marbella's golf course.

---

[1] All further statutory references are to the Civil Code unless otherwise stated.

3

*Trial*

## A. Plaintiff's Disability

At trial, plaintiff testified he was in good physical health when he joined Marbella, but he later was diagnosed with PAH in 2011. PAH is high blood pressure isolated to the lungs. Because of his PAH, plaintiff claimed he could not exert himself or walk-up inclines without experiencing shortness of breath. The golf course at Marbella included hills and inclines, and plaintiff testified he had to use a golf cart wherever he needed on the golf course to get to his ball. The parties stipulated plaintiff was disabled within the meaning of the ADA and Unruh Civil Rights Act.

## B. Marbella's Policies Regarding Golf Carts

Marbella's former general manager, Theodore Axe, testified Marbella had rules regarding where golfers could drive their golf carts. He testified these rules were necessary from a "safety standpoint" and "traffic standpoint" because the golf carts had no seat belts and could also damage the golf course. He noted it was common for golf courses, private clubs, and hotels to have policies governing the use of golf carts. As a general rule, Marbella required golf carts to be driven on the cart paths, which were all over the golf course and "encompass[ed] the entire 18 holes of golf." The golf carts could not be driven over sprinkler heads or areas that were newly planted, wet, or under repair. The carts also could not approach closer than 10 yards to any tee, green, bunker, or respective shoulder.

In February 2014, Marbella implemented a special cart access flag (SCAF) policy, which is central to the instant appeal. According to Marbella's general manager, the SCAF policy, which is also known as the "blue flag" policy, is a standard policy used by various golf clubs throughout the country. Defendants created the SCAF policy to provide greater access to the golf course to disabled golfers. Under the SCAF policy, members who had a handicap placard from the Department of Motor Vehicles or doctor's

4

note confirming their physical limitations could obtain a blue SCAF flag for their golf cart.[2] With the blue flag, golfers could: (1) "drive golf carts on the golf course, at the sole discretion of management, when holes are not accessible to golf carts (i.e., after light rain, or during the grow-in about 21 days after over-seeding, etc.) as course conditions permit"; and (2) "drive golf carts on specific holes designated by management, when the 'gate system' is closed on that hole (course conditions permitting)." The former was "limited to fairways only and not roughs, with the exception of entering and exiting the hole."

Axe testified the SCAF policy was intended to "allow people with restrictions . . . to enter the golf course on days that other members [were not] able to enter it at all." In other words, the policy provided members with the blue flag "additional access to the golf course."

But the SCAF policy still imposed some restrictions. Members who had a blue flag could not drive their golf carts: (1) "on the par three holes (4, 7, 11, 16)"; (2) "on holes twelve (12) and fifteen (15)"; (3) "on down-hill, 'rough height' slopes on holes nine (9) and eighteen (18) or any other specifically posted areas by the Golf Course Superintendent"; or (4) "within 30 feet of the Green." When asked to explain these restrictions, Marbella's head golf professional, Mark McDonough, testified golf carts could not go on the par three holes or holes 12 and 15 because "the cart paths are relatively close to the playing area and walking to those balls would be at a very minimum." Axe also testified golf carts were allowed on holes 9 and 18 but not on the steep downhill portions of those holes for safety reasons because the carts could spin out and flip over.[3]

---

[2]     Members initially were required to pay $25 to obtain the blue SCAF flag. This fee was eliminated in September 2014.

[3]     Plaintiff discusses an "orange flag" policy and claims the SCAF policy was nearly identical to the "orange flag" policy. Because this appeal focuses on the SCAF

Finally, there was signage on the golf course regarding cart path restrictions. The signs indicated certain holes were "cart path only."

C. Plaintiff's Requested Accommodation

In December 2014, Axe sent a letter to plaintiff indicating it was "reported to the Club that [plaintiff had] driven the Club's golf cart onto various portions of the Club's golf course . . . in violation of . . . current policies regarding golf cart access." Among other things, the letter stated all members had to abide by Marbella's policies but noted there was a SCAF policy for members with physical limitations. The letter informed plaintiff he could obtain a SCAF flag if he provided documentation of a handicap placard from the Department of Motor Vehicles or a doctor's note along with a signed copy of the SCAF policy. The letter concluded plaintiff was required to abide by Marbella's policies regarding golf cart operation and cart routes "[u]nless and until [he] qualif[ied] for a [SCAF] flag."

Plaintiff testified he met with Axe after he received the letter. He told Axe he could not sign the letter and that he needed "to get to [the] ball" "[i]n order . . . to play golf." He also asked Axe to make an exception to the SCAF policy for him. According to plaintiff, Axe said he would consider an exception for plaintiff but asked him to first sign the letter. Plaintiff refused to sign the letter. During cross-examination, plaintiff agreed Axe never told him he could not drive the golf cart to his golf ball. He also testified he continued to drive his golf cart to the golf ball ever since that time. In spite of the SCAF policy, plaintiff testified he drove his golf cart on the par three holes, holes 12 and 15, and the downhill slopes on holes 9 and 18. He also agreed defendants did not discipline him for driving in those areas, which was banned under the SCAF policy.

policy, we need not summarize the "orange flag" policy.

6

According to Axe's testimony, he mailed the SCAF policy to plaintiff, and plaintiff asked him, "Are you saying that I have to follow every aspect of this policy?" Axe testified he said, "No, I'm not, I actually want to talk to you about this, so that I can have you get to a place where you do the very best that you can." He specifically asked to meet plaintiff in person to discuss plaintiff's limitations and to provide plaintiff with appropriate accommodations. After plaintiff refused to sign the SCAF policy, Axe conferred with his legal department and decided plaintiff did not have to sign the SCAF policy. He also testified it was never defendants' intention to force plaintiff to sign the policy. Axe later met with plaintiff and his "advisory board of members" and "did everything in [his] power to try to understand the limitations that [plaintiff] had so [he] could provide him with additional access to the golf course . . . ."

McDonough similarly testified plaintiff talked to him about the SCAF policy and how it prevented plaintiff from playing golf. Plaintiff told McDonough he would not sign the SCAF policy, and McDonough relayed plaintiff's concerns to Axe.

D. Marbella's Announcements

When asked if anything changed after plaintiff refused to sign the SCAF policy, plaintiff testified someone would come out of the pro shop and tell him: "[D]on't forget the blue flag policy" and "[d]on't you drive on the par 3's . . . , and the 12th and 15th and down the 9th and the 18th, don't forget that." He also testified Marbella's staff made pre-tournament announcements over the microphone. He claimed the announcements reminded plaintiff to "remember the blue flag policy" or "remember, Mr. Lurner, par 3's are cart path only . . . ." Plaintiff ignored the announcements and continued to drive his golf cart on the restricted areas. He also testified he was harassed by other members after the pre-tournament announcements were made.

When plaintiff complained to Axe about the announcements, Axe said he did not know about the announcements and would "take care of it." The subsequent pre-

7

tournament announcements no longer referenced plaintiff. Instead, the announcements generally reminded members that "'par 3's are golf cart path only.'" But plaintiff testified other members still harassed him for driving his golf cart in restricted areas of the golf course.

### E. Complaints From Members

Axe testified he notified members who complained about plaintiff driving his cart to the ball that plaintiff needed to do so because he had a physical disability. Likewise, McDonough testified management asked members who complained about plaintiff "for their understanding" and "told them that [plaintiff] had some physical disabilities and that the Club [was] working with him." When asked why management did not send an e-mail to all members informing them about plaintiff's disability, Axe testified they did not want to violate plaintiff's privacy rights and they "generally wouldn't send emails like that to the entire membership at large." He explained: "In a private country club, we're careful on how many emails we send out, and we just don't bombard our membership with individual isolated items like that. It's just not customary that we would do anything like that." He added that it would be against their policies and practices regarding communications with their members.

Plaintiff later met with McDonough and Owen Westervelt, another former general manager at Marbella, in 2017. Plaintiff asked for help because members were upset that he was violating the SCAF policy. According to plaintiff's testimony, he asked McDonough and Westervelt to change the SCAF policy or to let other members know he was exempt from complying with the policy. Plaintiff also asked them to put something in writing indicating he could violate the rules. After McDonough and Westervelt said they could not do that, plaintiff requested they send an e-mail to all members informing them about plaintiff's disability. McDonough and Westervelt did not think it would be appropriate to notify all members about every person who had a disability due to privacy

8

concerns. But plaintiff testified Westervelt was sympathetic to him and listened to his concerns. McDonough ultimately decided to keep a note describing plaintiff's disability in the pro shop so the pro shop staff would be aware of it and respond to members who expressed concern. If members complained about plaintiff, McDonough testified his staff was instructed to relay the message that plaintiff "has a serious and chronic disease and we are working with him to do our best to accommodate."

Marbella's policies also generally prohibited inappropriate conduct by its members and required members to report any misbehavior. For example, Marbella's rules and regulations stated: "Members are to conduct themselves in a manner which will not interfere with other Members' or their guests' enjoyment of the Club. Obnoxious or abusive language and rude or boisterous behavior is prohibited." The rules and regulations further stated: "Members are requested to report misbehavior or violations of rules . . . and all violations will be subject to appropriate disciplinary action."

Finally, defendants introduced evidence suggesting plaintiff may have experienced animosity from other members, in part, because of his own behavior. For example, plaintiff was suspended from Marbella for 30 days after challenging other golfers to a fistfight after he hit his ball into a bunker on their fairway and interrupted their game by searching for his ball in their line of play. He also challenged another member to a fight after he hit his ball into the member's foursome playing ahead of him and the member told plaintiff never to do it again. Plaintiff claimed the other member threatened to kill him, but a bystander rebutted his testimony. Axe further testified plaintiff "did not follow even some of the reasonable rules that we asked him to follow." Axe noted plaintiff drove his golf cart on top of recently planted, delicate grass in violation of Marbella's policies on one occasion.

F. Adaptive Cart Policy and Suspension of Plaintiff's Membership

After plaintiff filed the instant action in 2018, Marbella adopted an adaptive cart policy. In March 2019, Marbella notified its members it had acquired an adaptive golf cart and provided a revised policy regarding the adaptive cart. The policy stated: "Club Members and/or their guests with disabilities may request use of the Club's adaptive cart, or, alternatively, may bring their own adaptive cart(s) to the Club for use while playing golf, subject to inspection and approval by the Club. Adaptive carts may be driven on any portion of the Club's golf course that is determined by the Club to be safely accessible, including, but not limited to, all par three and 'cart path only' holes." In August 2019, defendants updated the policy to allow disabled members with a yellow flag to use a regular golf cart with the same privileges of an adaptive cart if the adaptive cart was unavailable. Plaintiff used both the adaptive cart and a golf cart with a yellow flag.

In May 2019, Marbella suspended plaintiff's membership for 30 days because he drove his adaptive cart into a bunker. A bunker is a sandy area on the golf course with steep slopes on certain sides. The sand is also soft, which can cause golf carts to tip over. Although no one told plaintiff he could not drive into bunkers, Marbella's general manager testified it was "common sense" in the industry that a person's membership would be suspended if he or she drove into a bunker, which was dangerous.

*Jury Verdict, JNOV Motion, and Motion for New Trial*

In 2021, the jury returned a verdict in favor of defendants. The jury found defendants did not "discriminate against or deny [plaintiff] full and equal access to and enjoyment of accommodations or advantages or facilities or services at [Marbella] at any time after May 14, 2016." After judgment was entered, plaintiff filed a JNOV motion and a motion for new trial. Plaintiff generally argued there was no substantial evidence

10

to support the jury's verdict that defendants did not violate the ADA or Unruh Civil Rights Act. He claimed the undisputed evidence showed defendants did not provide an effective modification of the SCAF policy for him.

The court denied plaintiff's motions. Although the court noted the SCAF policy "as written prohibited even golfers with disabilities full access to every hole on the course," the court held substantial evidence established defendants modified the SCAF policy for plaintiff. The court noted the general manager never told plaintiff he could not drive his golf cart to his ball after plaintiff notified the general manager about his disability. The court also emphasized plaintiff continued to drive his golf cart to his ball ever since that time and was never disciplined for doing so. The court accordingly concluded the SCAF policy was not enforced against plaintiff. With respect to plaintiff's suggestion that a change in policy must be in writing or communicated to other members, the court noted plaintiff cited no authority for this proposition. The court further declined to assume a written modification would have been effective at preventing other members from becoming upset with plaintiff for driving his golf cart in certain areas of the course. Plaintiff appealed.

DISCUSSION

Plaintiff contends the SCAF policy was facially discriminatory. He also argues the court erred by finding defendants modified the SCAF policy for him. Although plaintiff concedes defendants did not discipline him for violating the SCAF policy, he claims they did not provide a reasonable modification of the policy for him. He further argues defendants imposed "de facto discipline" because they allowed other members to harass him. Finally, plaintiff argues the court erred by allowing defendants' ADA expert to opine on legal issues.

We disagree with plaintiff's contentions. Assuming, arguendo, the SCAF policy had a discriminatory effect in practice, defendants provided a reasonable

11

modification of the policy for plaintiff.  Any error regarding the expert witness testimony did not result in a miscarriage of justice.

*The Court Did Not Err by Denying Plaintiff's JNOV Motion or Motion for New Trial*

A.  Standards of Review

"""The trial court's discretion in granting a motion for judgment notwithstanding the verdict is severely limited."  [Citation.] "'. . . [Citations.]  The trial judge cannot reweigh the evidence [citation], or judge the credibility of witnesses.  [Citation.]  If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied.  [Citations.]  "A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict.  If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied."  [Citation.]'" [Citation.]' [Citation.] 'On review of an order granting JNOV, we "'must resolve any conflict in the evidence and draw all reasonable inferences therefrom in favor of the jury's verdict.'""" (*Simmons v. Ware* (2013) 213 Cal.App.4th 1035, 1047-1048.)  Our determination as to the requisite substantial evidence is de novo.  (*IIG Wireless, Inc. v. Yi* (2018) 22 Cal.App.5th 630, 639.)  When the JNOV motion raises legal issues like the interpretation of a statute or the application of law to undisputed facts, we review the trial court's ruling under a de novo standard of review.  (*Brown v. City of Sacramento* (2019) 37 Cal.App.5th 587, 598.)

"A new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict . . . unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision."  (Code Civ. Proc., § 657, subd. (7).)  "'A trial court has broad discretion in ruling on a new trial

12

motion, and the court's exercise of discretion is accorded great deference on appeal.'" (*Hasso v. Hapke* (2014) 227 Cal.App.4th 107, 119.) "'We defer to the trial court's factual determination when the court grants a motion for new trial, not when the court denies such a motion. When the court denies the motion, we presume the jury's verdict is correct.'" (*Ibid.*)

#### B. Applicable Law

The Unruh Act provides: "All persons within the jurisdiction of this state . . . no matter what their . . . disability . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (§ 51, subd. (b).) A violation of a person's rights under the ADA is also a violation of the Unruh Act. (*Id.*, subd. (f).)

Title III of the ADA provides in pertinent part: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." (42 U.S.C. § 12182(a).) The ADA defines discrimination as "*a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary* to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations." (*Id.*, § 12182(b)(2)(A)(ii), italics added.)

To prevail on an ADA discrimination claim, the plaintiff must show: "(1) he is disabled as that term is defined by the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; (3) the defendant employed a discriminatory policy or practice; and (4) the defendant discriminated against the plaintiff

13

based upon the plaintiff's disability by (a) failing to make a requested reasonable modification that was (b) necessary to accommodate the plaintiff's disability." (*Fortyune v. American Multi-Cinema, Inc.* (9th Cir. 2004) 364 F.3d 1075, 1082 (*Fortyune*).)

### C. Discriminatory Policy

Because neither party disputes plaintiff is disabled or that Marbella is a place of public accommodation, the first question is whether defendants instituted a discriminatory policy or practice. Relying on *Sailboat Bend Sober v. City of Fort Lauderdale* (11th Cir. 2022) 46 F.4th 1268, defendants contend the SCAF policy was not facially discriminatory because it generally provided disabled golfers with greater cart access to the golf course than nondisabled golfers. (*Id.* at p. 1274 [finding a zoning ordinance was not facially discriminatory where it treated individuals with disabilities more favorably than it treated similarly situated, nondisabled individuals].) But as the trial court properly noted, the SCAF policy as written prohibited disabled golfers' full access to every hole on the course. Indeed, defendants concede the SCAF policy-imposed restrictions on where disabled golfers could drive their golf carts, which included the par three holes, holes 12 and 15, the slopes on holes 9 and 18, and within 30 feet of the green. Assuming, without deciding, the SCAF policy had a discriminatory effect in practice, defendants provided a reasonable modification of the policy for plaintiff.

### D. Reasonable Modification

As noted *ante*, plaintiff must show defendants discriminated against him by "failing to make a requested reasonable modification that was . . . necessary to accommodate [his] disability." (*Fortyune*, *supra*, 364 F.3d at p. 1082.) "[A]n individualized inquiry must be made to determine whether a specific modification for a

14

particular person's disability would be reasonable under the circumstances as well as necessary for that person, and yet at the same time not work a fundamental alteration." (*PGA Tour, Inc. v. Martin* (2001) 532 U.S. 661, 688.)  "Public accommodations must [consider] how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience."  (*Baughman v. Walt Disney World Co.* (9th Cir. 2012) 685 F.3d 1131, 1135.)  "Facilities are not required to make any and all possible accommodations that would provide full and equal access to disabled patrons; they need only make accommodations that are reasonable.  In deciding what's reasonable, facilities may consider the costs of such accommodations, disruption of their business and safety.  But they must also take into account evolving technology that might make it cheaper and easier to ameliorate the plight of the disabled."  (*Ibid.*)

Here, there was substantial evidence defendants modified the SCAF policy for plaintiff by allowing him to drive his golf cart on restricted areas of the golf course. Plaintiff testified he drove his golf cart on prohibited areas after he told management about his disability, and defendants allowed him to do so and never disciplined him for it. Management also notified members who complained about plaintiff that plaintiff needed to drive his cart to the ball because of his disability.  Indeed, McDonough kept a note describing plaintiff's disability in the pro shop so staff could appropriately respond to complaining members.  The pro shop staff was instructed to tell members plaintiff had "a serious and chronic disease" and Marbella was "working with him to do our best to accommodate."  Finally, plaintiff continued playing numerous rounds of golf at Marbella prior to trial.

Plaintiff points to different evidence to support his contention that defendants did not provide a reasonable modification of the SCAF policy for him.  He notes certain pre-tournament announcements asked him to "'remember the Blue Flag Policy'" and to remember "'par 3's are cart path only . . . .'"  But plaintiff acknowledges he thereafter notified the general manager who told plaintiff he did not know about the

15

announcements and "would take care of it."  No further announcements were directed at plaintiff.

Plaintiff also relies on one letter and three e-mails that he claims Marbella management sent to all members in 2014, 2018, 2019, and 2020.  The communications reminded members to follow Marbella's policies, told them to keep their carts in the fairways and avoid driving in the rough, noted par 3 holes as well as holes 12 and 15 were cart path only, and indicated members should not drive down the slopes on holes 9 and 18.  The communications also asked members with a blue flag to abide by golf cart access restrictions and to not drive on the lower half of holes 9 or 18.  These communications do not establish defendants failed to provide a reasonable modification of the SCAF policy for plaintiff.  Plaintiff also cites no authority suggesting defendants had to state plaintiff was excluded from following the SCAF policy in generalized communications with members.

Plaintiff next claims management told members plaintiff was not exempt from the SCAF policy.  He points to a November 2014 e-mail from a member to the general manager complaining about plaintiff.[4]  Among other things, the e-mail states:  "I understand from previous conversations with both you and Mark that [plaintiff] has been told what he can and cannot do, yet he drives wherever he wants."  Even if this e-mail could be interpreted as suggesting management told members that plaintiff was required to follow the SCAF policy, there was other evidence management told complaining members plaintiff needed to drive his cart to the ball because of his disability.  We """"must resolve any conflict in the evidence and draw all reasonable inferences therefrom in favor of the jury's verdict.""""  (*Simmons v. Ware*, *supra*, 213 Cal.App.4th at p. 1048.)

_____

[4]  Although plaintiff points to various examples from 2014, the jury verdict form asked the jury to determine whether defendants discriminated against plaintiff or denied him full and equal access at any time after May 14, 2016.

16

Plaintiff further emphasizes defendants created the SCAF policy, in part, as a response to member and staff complaints about plaintiff. He notes Axe testified one of the reasons defendants developed the SCAF policy was to address complaints about plaintiff driving on prohibited areas of the golf course. But this evidence says nothing about whether defendants ultimately provided a reasonable modification of the SCAF policy, which was initially intended to provide greater access to the golf course to disabled golfers.

Plaintiff also argues defendants did not provide a reasonable modification of the SCAF policy because they did not withdraw the policy or provide a written modification for him. According to plaintiff, "informally deciding not to discipline someone for violating a . . . policy" is not a modification of the policy. Plaintiff cites no authority, and we are aware of none, suggesting a modification must be written or a policy must be withdrawn in some official way to be effective under the ADA. As defendants properly note, there is no requirement in the ADA that the modification of a policy be in writing. Likewise, there is no such requirement in the United States Department of Justice (DOJ) regulations interpreting the ADA. (28 C.F.R. § 36.302 (2016).) The DOJ comments to the regulations are instructive: "[A] parking facility would be required to modify a rule barring all vans or all vans with raised roofs, if an individual who uses a wheelchair accessible van wishes to park in that facility, and if overhead structures are high enough to accommodate the height of the van. A department store may need to modify a policy of only permitting one person at a time in a dressing room, if an individual with mental retardation needs and requests assistance in dressing from a companion." (28 C.F.R. § 36, appen. C(C) (2017); NTS Am.Jur.2d (2023) Americans with Disabilities Act, § 686.) In these examples, the establishment modifies an existing policy by not enforcing it against a disabled patron. Likewise, here, defendants provided a reasonable modification of the SCAF policy for plaintiff by allowing him to disregard the policy and drive his golf cart wherever he needed to on the

17

golf course. In reaching this conclusion, we are not suggesting a modification never has to be in writing. Indeed, we acknowledge it could be required in other cases depending on the facts at hand.

Finally, plaintiff contends defendants imposed "de facto discipline" by "manipulating their members to punish" him. He claims defendants could have prevented the harassment by telling members plaintiff was exempt from the SCAF policy. But there *was* evidence defendants informed complaining members plaintiff needed to drive his cart to the ball because of his disability. Plaintiff points to no authority suggesting defendants had to inform all Marbella members about plaintiff's disability. The cases plaintiff cites are inapposite. In *Fortyune*, *supra*, 364 F.3d 1075, the Ninth Circuit Court of Appeals held a movie theater violated the ADA because it refused to accommodate a disabled person's request to remove a "noncompanion" from a "companion seat" adjacent to wheelchair spaces. (*Id.* at pp. 1082-1083.) *Celano v. Marriott Int'l, Inc.* (N.D.Cal., Jan. 28, 2008, No. C 05-4004 PJH) 2008 U.S.Dist. Lexis 6172 concerned Marriott's failure to provide single rider golf carts at any of its golf courses. Neither *Fortyune* nor *Celano* concerned harassment from an establishment's members.

For the foregoing reasons, the court did not err by denying plaintiff's motion for new trial or JNOV motion, and there was substantial evidence supporting the jury's verdict defendants did not discriminate against plaintiff.


*Purported Error Regarding Expert Testimony Did Not Result in a Miscarriage of Justice*

Plaintiff next argues the court erred by allowing defendants' ADA expert, Chris Vaughan, to offer his opinion on whether defendants modified their policies and violated the ADA. Vaughn was an attorney and held certifications as an ADA consultant. Even assuming the court erred by admitting some of Vaughn's testimony, there was no miscarriage of justice.

18

A.  Applicable Law and Standard of Review

An expert witness's testimony must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).)  "Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805.)  But "an expert is not allowed 'to testify to legal conclusions in the guise of expert opinion.  Such legal conclusions do not constitute substantial evidence.  [Citation.]  "The manner in which the law should apply to particular facts is a legal question and is not subject to expert opinion."'" (*King v. State of California* (2015) 242 Cal.App.4th 265, 292.)

We review a trial court's decision to admit expert testimony for an abuse of discretion.  (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)  An abuse of discretion occurs only if "'the trial court's decision exceeds the bounds of reason and results in a miscarriage of justice.'" (*Orange Catholic Foundation v. Arvizu* (2018) 28 Cal.App.5th 283, 292.)

B.  Disputed Testimony

In arguing defendants' expert improperly opined on legal issues and usurped the role of the jury, plaintiff points to the following two examples of his testimony.

1. "Q[:]  Okay.  Did you find the golf course at Marbella to be accessible as required by the A.D.A. standards?" "[A:]  Yes, I did." The court overruled plaintiff's following objections: "Ultimate fact.  Legal conclusion."

2. "Q[:]  Sir, I'm asking if you could please explain to the ladies and gentlemen of the jury any scenario where the course [at Marbella] would be accessible pursuant to the [ADA] when this [SCAF] policy is enforced? [¶]  A[:]  Yes.  In a circumstance where there was no penalty or sanction for violating the policy.  [¶]  Q[:]

19

That's not enforcing the policy; right? [¶] A[:] It's modifying its practice, procedure or policy to accommodate a person with a disability."

The second example concerns questions asked by plaintiff's own counsel on cross-examination. We do not see how the court could have abused its discretion with respect to testimony solicited by plaintiff's counsel. There were no objections for the court to consider. Regardless, assuming it was error to permit Vaughn to testify on the above issues as an expert, we may reverse only if the error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; Evid. Code § 354.) A miscarriage of justice occurs when there is a reasonable chance a result more favorable to the appealing party would have been reached. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.) We do not believe that to be the case here.

The jury heard competing testimony from plaintiff's ADA expert, Steven Schraibman, who repeatedly testified the SCAF policy excluded members with disabilities. He also suggested the rules preceding the SCAF policy included the same limitations as the SCAF policy. When asked if those rules affected accessibility to people with disabilities, Schraibman testified: "It limits their ability to play a full round of golf." "[S]o with a disability you don't get equal service." On cross-examination, defendants' counsel asked if Marbella "accommodated [plaintiff] by not enforcing its restrictions on him to allow him to drive his cart wherever on the course he wanted . . . ." Schraibman testified: "No." He later added: "[Plaintiff] may have driven it on whatever the holes he wanted to or as needed as he said, but in actual fact, there's no modification to policy and procedures." On redirect, plaintiff's counsel asked: "So failing to enforce a policy that doesn't give equal access does not modify that policy that fails to give equal access; true?" Schraibman testified: "Correct." Given the conflicting evidence, we cannot conclude there was a miscarriage of justice. "At worst, the two experts simply canceled each other out." (*Barboni v. Tuomi* (2012) 210 Cal.App.4th 340, 353.) As discussed *ante*, there also was substantial evidence defendants modified the SCAF policy

20

for plaintiff by allowing him to drive his golf cart on restricted areas. Plaintiff told management he essentially needed to violate the SCAF policy, proceeded to drive his golf cart on prohibited areas, played numerous rounds of golf up until trial, and was never disciplined for it. There also was evidence management told complaining members they were "working with" plaintiff because of his disability. We accordingly find no reversible error.

## DISPOSITION

The judgment is affirmed. Defendants shall recover their costs incurred on appeal.

SANCHEZ, ACTING P. J.

WE CONCUR:

MOTOIKE, J.

DELANEY, J.

21